IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NORTHEASTERN DIVISION

ANITA FARLEY HOWL          )
                           )
v.                         )          NO. 2:08-0038
                           )
MICHAEL J. ASTRUE,         )
Commissioner of Social Security )

To: The Honorable John T. Nixon, Senior District Judge

## REPORT AND RECOMMENDATION

The plaintiff filed this action pursuant to 42 U.S.C. § 405(g) to obtain judicial review of the final decision of the Commissioner of Social Security denying her application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"), as provided by the Social Security Act ("the Act").

Upon review of the Administrative Record as a whole, the Court finds that the Commissioner's determination that the plaintiff could perform past relevant work during the relevant time period is supported by substantial evidence in the record as required by 42 U.S.C. § 405(g), and that the plaintiff's motion for judgment on the record (Docket Entry No. 11) should be denied, and the defendant's motion for "judgment on the pleadings" (Docket Entry No. 15) be granted.[1]

---

[1] Although, for whatever reason, the defendant styled its filing as a motion for "judgment on the pleadings," the defendant responds to the plaintiff's motion, to which the plaintiff filed a reply (Docket Entry No. 17).

# I. INTRODUCTION

The plaintiff filed applications for DIB and SSI benefits on June 16, 2003 (tr. 96-99),[2] alleging disability due to fibromyalgia, myofascial pain, and pain in her neck, back, shoulder, and wrist, with a disability onset date of February 28, 2000.[3] (Tr. 96-99, 103.) The plaintiff's applications were denied initially and upon reconsideration. (Tr. 40-43, 56-63.) A hearing before Administrative Law Judge ("ALJ") George L. Evans, III, was held on September 26, 2005. (Tr. 662-703.) The ALJ delivered an unfavorable decision on February 1, 2006, (tr. 47-55), and the plaintiff sought review of that decision by the Appeals Council. On August 4, 2006, the Appeals Council vacated the ALJ's decision, and remanded the case for a new hearing.[4] (Tr. 69-72.) On January 19, 2007, a second hearing before ALJ Evans was held. (Tr. 704-70.) The ALJ delivered a second unfavorable decision on May 21, 2007 (tr. 16-27), and the plaintiff sought review of that decision by the Appeals Council. (Tr. 9.) On May 9, 2008, the Appeals Council denied the plaintiff's second request for review (tr. 9-11), and the ALJ's decision became the final decision of the Commissioner.

---

[2] The plaintiff's application for DIB is dated June 16, 2003 (tr. 96), but the record does not contain her application for SSI. Plaintiff's counsel represented that her DIB and SSI applications had a protected filing date of May 30, 2003, *see* Docket Entry No. 12, at 1, but there is no indication of such a filing date on her DIB application, and her SSI application is not a part of the record. However, the ALJ determined that her DIB and SSI applications were protectively filed on May, 30, 2003. (Tr. 16.)

[3] Although the plaintiff alleged a disability onset date of February 28, 2000, she asks the Court "to approve her claim for benefits for twelve months retroactively to that date, and for a closed period of disability until November 2006." Docket Entry No. 12, at 2. Presumably, the plaintiff has now returned to substantial gainful employment.

[4] The case was remanded for the ALJ to further consider treating and examining source opinions and explain the weight given to those opinions; to obtain additional evidence to clarify the nature and severity of the plaintiff's mental impairments; to further evaluate the plaintiff's subjective complaints and provide a rationale for evaluation of her symptoms; to further consider the plaintiff's RFC and provide a rationale for her limitations; and, if appropriate, to obtain additional evidence from a vocational expert.

## II. BACKGROUND

The plaintiff was born on May 19, 1962, and was 37 years old as of February 28, 2000, her alleged onset date. (Tr. 96.) She completed the tenth grade, earned a GED, attended barber school, and received a bachelor's degree in history and a master's degree in business administration. (Tr. 109, 710.) Her past jobs include employment as a barber, manager trainee, painter, sales clerk, rack jobber, coordinator of a satellite resource center, account executive for sales, field representative, and bookkeeper. (Tr. 104, 110.)

### A. Chronological Background: Procedural Developments and Medical Records

Prior to her alleged onset date, the plaintiff had a history of complaints of chronic pain in her upper left extremity. (Tr. 228-279.) On August 12, 1991, the plaintiff presented to Dr. James B. Talmage, an orthopedic surgeon, with complaints of left shoulder pain and fibromyalgia. (Tr. 228.) He noted that the she had "markedly improved" since receiving trigger point injections, attending physical therapy sessions, and taking Pamelor.[5] *Id.*

On January 15, 1996, the plaintiff presented to Dr. John W. Hutchison, a neurosurgeon, with complaints of left shoulder pain that radiated to her neck and down her left arm. (Tr. 229.) An x-ray of the her left shoulder blade revealed that she had no fractures, dislocations, or other bone or joint abnormalities. (Tr. 231.) Dr. Hutchison diagnosed the plaintiff with "[c]hronic myofascial pain with trigger point on the left scapula," noted that her mental status was "normal," and determined that she had a "fairly good" range of motion in her left shoulder. (Tr. 230.)

---

[5] Pamelor is used to treat depression and sleeplessness. WebMD, "Pamelor" at http://www.webmd.com/drugs/drug-1820-Pamelor+Oral.aspx?drugid=1820&drugname=Pamelor+Oral.

On August 15, 1996, Dr. Kenneth R. Lister, an anesthesiologist at The Pain Control Center, gave the plaintiff trigger point injections of Depoject[6] and Marcaine[7] for her chronic back pain. (Tr. 233, 482.) Dr. Lister noted that an MRI of the plaintiff's thoracic spine and shoulder were negative, opined that "her manic nature and postural problems contribute[d] to [her] chronic myofascial pain," expressed concern that she was "habituated to Soma,"[8] and suggested that she undergo further trigger point injections along with chiropractic therapy and biofeedback. *Id.* On January 31, 1997, Dr. Lister again examined the plaintiff for upper back chronic pain disorder, gave her trigger point injections, and prescribed Elavil,[9] Clonidine,[10] and Flexeril.[11] (Tr. 232.)

Between February of 1997 and December of 1997, the plaintiff presented to Dr. Richard Berkman, a neurosurgeon, on multiple occasions. (Tr. 235-36, 261-62, 270-72.) A myelogram showed "mild to moderate cervical spondylitic disease at C5-6" (tr. 270), a result of which Dr. Berkman performed a cervical diskectomy, fusion, and plate insertion at C5-6 in December of 1997. (Tr. 236, 261.) On January 19, 1998, the plaintiff returned to Dr. Berkman post surgery, with complaints of severe pain and, after reviewing an x-ray of her cervical spine, he had no "explanation

---

[6] Depoject is an anti-inflammatory injection for the soft tissue. Saunders Pharmaceutical Word Book 210 (2009) ("Saunders").

[7] Marcaine is a "local anesthetic" injection. Saunders at 426.

[8] Soma is prescribed as a skeletal muscle relaxant. Saunders at 653.

[9] Elavil is used to treat mental and mood disorders and nerve pain. WebMD, "Elavil" at http://www.webmd.com/drugs/drug-1807-Elavil+Oral.aspx?drugid=1807&drugname=Elavil+Oral&source=1.

[10] Clonidine is used to treat hypertension. Physicians Desk Reference 884-85 (64th ed. 2010) ("PDR").

[11] Flexeril is prescribed as a skeletal muscle relaxant. Saunders at 295.

for her severe pain." (Tr. 259, 273.) Dr. Berkman also concluded that he could no longer offer any beneficial treatment to the plaintiff and suggested that she contact a psychiatrist or a chronic pain care facility. (Tr. 259.)

On February 11, 1998, the plaintiff presented to the Saint Thomas Hospital emergency room with complaints of shoulder and neck pain. (Tr. 254) X-rays showed that the bones in her left shoulder were normal and there was no evidence of fracture or soft tissue calcifications. (Tr. 255.) The plaintiff returned to Dr. Berkman on March 2, 1998, and reported that her arm and neck were "better" after surgery, but that she had pain in her left shoulder. (Tr. 257.) Dr. Berkman recommended that the plaintiff wean herself off of Soma and begin taking Ibuprofen. *Id.*

On March 24, 1998, the plaintiff presented to Dr. Melvin L. Blevins, a family practitioner, with complaints of severe cervical and left shoulder pain. (Tr. 455.) An x-ray of the plaintiff's cervical spine revealed a "marked straightening of the normal lordic curve" and an x-ray of her left shoulder showed "bony structures to be normal." (Tr. 462.) Dr. Blevins prescribed Soma and Ibuprofen to the plaintiff, referred her to Dr. Gary C. Stahlman, an orthopedic surgeon (tr. 455-57), and continued to examine the plaintiff on a monthly basis through January 4, 2000. (Tr. 431-54.)

On April 8, 1998, the plaintiff presented to Dr. Stahlman, an orthopaedist, with complaints of left shoulder pain, and he noted that she "clearly demonstrate[d] exaggerated pain behaviors and symptom magnification" and malingering. (Tr. 278-79.) Dr. Stahlman reviewed x-rays of the plaintiff's shoulder and found them to be normal, diagnosed her with "[c]hronic left shoulder pain syndrome without significant etiology," and ordered an MRI of her left shoulder. (Tr. 279.) On May 6, 1998, Dr. Stahlman reviewed the results of the plaintiff's MRI and found no evidence of

rotator cuff pathology. (Tr. 276.)  He also stated that the plaintiff "has been evaluated by numerous physicians who have not uncovered anything which is addressable." *Id.*

On October 9, 1999, the plaintiff presented to the Cookeville Regional Medical Center (CRMC) emergency room with complaints of neck pain. (Tr. 306-07.)  An x-ray of her cervical spine showed no fractures or soft tissue problems and she was diagnosed with acute myofascial strain and prescribed Soma. (Tr. 306-09, 312.)

Between February and October of 2000, Dr. Geren Brown, an orthopedic surgeon, examined the plaintiff on multiple occasions. (Tr. 313-16, 323-35.)  He diagnosed the plaintiff with "posttraumatic sublaxation left acromioclavicular joint with posttraumatic arthritis;" prescribed Hydrocodone (tr. 334-35), Valium, Mepergan,[12] (tr. 322)  Demerol,[13] Phenergan[14] (tr. 321), and Xanax;[15] (tr. 320) performed arthroscopic surgery (tr. 313-14) and an acromioclavicular joint reconstruction on her left shoulder (tr. 315-16); ordered a Nerve Conduction Velocity ("NCV")/Electromyography ("EMG") study[16] of her  acromioclavicular ("AC") joint;[17] noted that AC joint x-rays showed nothing "clinically significant" (tr. 329); and recommended that she undergo physical therapy. (Tr. 323-324.)  Dr. Brown also found that, even though the plaintiff continued to

---

[12] Mepergan is a narcotic analgesic and sedative. Saunders at 437.

[13] Demerol is a narcotic analgesic painkiller. Saunders at 208.

[14] Phenergan is an antihistamine and sedative. Saunders at 551.

[15] Xanax is a sedative used to treat panic disorders. Saunders at 768.

[16] An EMG/NCV study measures the electrical activity of muscles at rest and during contraction, and measures how well and how fast the nerves can send electrical signals. WebMD, "Electromyogram (EMG) and Nerve Conduction Studies" at http://www.webmd.com/brain/electromyogram-emg-and-nerve-conduction-studies.

[17] Apparently, the results of the NCV/EMG studies were normal. (Tr. 350.)

complain of severe left shoulder pain, there was "no evidence on any studies that we have done recently to confirm/demonstrate any pathology that would explain the amount of pain she describes," and he concluded that she needed "to be in a chronic pain management facility" and receive psychological counseling for what he "suspect[ed]" was "borderline personality deficit."[18] (Tr. 320.)

On September 25, 2002, the plaintiff was involved in a motor vehicle accident and was transported to CRMC's emergency room. (Tr. 338, 427.) X-rays taken of the plaintiff's spine were normal and showed no evidence of any significant injury. (Tr. 338-40.) In October of 2002, the plaintiff presented to Dr. Blevins with complaints of musculoskeletal pain and requested pain medication. (Tr. 428.) Dr. Blevins described the plaintiff's pain complaints as "exquisite" (*id*), and an MRI of her lumbar spine revealed some mild disc bulging at L5-S1 with very minimal degenerative spinal stenosis. (Tr. 458.) Dr. Blevins concluded that the plaintiff's pain seemed "inordinate" to her MRI results and prescribed Lortab,[19] Mepergan, and Phenergan, but he declined to prescribe Soma. (Tr. 427-29.)

---

[18] On November 7, 2000, Dr. Brown wrote to the plaintiff as follows:
It is very obvious to me, as an orthopedic surgeon, that I will no longer be able to help you with the problem in your left shoulder. . . . At this time, we are dismissing you from the practice. I will not make you another appointment or do any further treatment to this shoulder. My best advice to you would be to find a chronic pain treatment facility that is comprehensive offering physical therapy, physical medicine, and psychiatric evaluations. . . . At this point your orthopedic problems we have been treating are stable and do not need any specific followup. . . .
(Tr. 318.)

[19] Lortab, also known as Hydrocodone, is a narcotic painkiller and fever reducer. Saunders at 415.

On October 29, 2002, the plaintiff presented to Dr. Jestus, a neurosurgeon, upon referral from Dr. Blevins, with complaints of back pain. (Tr. 342-43.) Dr. Jestus reviewed the plaintiff's MRI and diagnosed her with a lumbar sprain. *Id.* The plaintiff requested Mepergan from Dr. Jestus, but he refused to prescribe it and he told her that her lumbar sprain could be treated with anti-inflammatory medications, muscle relaxers, and time. (Tr. 343.) Dr. Jestus prescribed Vicodin[20] but discouraged her from taking it for long periods of time. *Id.*

From November of 2002 to January of 2003, the plaintiff presented to Spectrum Pain Clinic on four occasions with complaints of lower back pain and left shoulder pain. She reported at her first visit that her pain without medication was a 9 out of 10 and her pain with medication was from 0 to 3 out of 10, at her second visit her pain was an 8 out of 10 without medication and a 1 out of 10 with medication, at her third visit her pain was from 3 to 4 out of 10 without medication and 0 to 1 out of 10 with medication, and at her fourth visit her pain was a 3 out of 10 without medication and from 1 to 2 out of 10 with medication. (Tr. 345-49.)

On February 11, 2003, the plaintiff presented to Dr. Blevins and he noted that her "complaints [were] somewhat bizarre" and prescribed MS Contin.[21] (Tr. 426.) Dr. Blevins continued to examine the plaintiff on a monthly basis and prescribe MS Contin. (Tr. 410-25.) On May 27, 2003, Dr. Blevins wrote a letter on the plaintiff's behalf detailing his diagnoses and treatment and he stated that her most recent motor vehicle accident had "made it impossible for her to maintain gainful employment." (Tr. 421-25.) On July 28, 2003, Dr. Blevins examined the

---

[20] Vicodin is prescribed for the relief of moderate to moderately severe pain. PDR at 560.

[21] MS Contin is a controlled release morphine sulfate prescribed for the management of moderate to severe pain. PDR at 2804.

plaintiff, diagnosed her with elbow tendinitis, and referred her to Dr. Francisca Lytle, an orthopedic surgeon. (Tr. 418.)

The plaintiff presented to Dr. Lytle on August 6, 2003, with complaints of numbness in her left hand and left elbow pain that radiated to her neck and lumbar region. (Tr. 350.) Dr. Lytle determined that she might have ulnar neuritis and recommended that she undergo another NCV/EMG study. *Id.*

On August 19, 2003, Mary Kay Matthews, L.P.E. (licensed psychological examiner), authored a report of a Mental Status Exam conducted by Olga Kendrick (tr. 351-56), finding that the plaintiff was fully oriented, had "no problems with her memory or thinking," functioned in at least the average range of intelligence, could appropriately relate to others, and had no mental impairments. (Tr. 353-55.) Ms. Kendrick assigned the plaintiff a Global Assessment of Functioning ("GAF") score of 60,[22] diagnosed her with neck, shoulder, back, and myofascial pain, and opined that she could function at a higher level if she had relief from her constant pain. (Tr. 355.)

On August 27, 2003, the plaintiff presented to Dr. Douglas B. Freels, an orthopedic surgeon, for a second opinion for her left elbow pain. (Tr. 402.) X-rays of the plaintiff's cervical spine were "unremarkable except for fusion at C5-6" and x-rays of her shoulder showed distal clavicle resection. *Id.* Dr. Freels recommended Ketoprofen[23] cream for her elbow and physical therapy. *Id.*

---

[22] The GAF scale is used to assess the social, occupational, and psychological functioning of adults. Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 34 (4th ed. 2000) ("DSM-IV-TR"). A GAF score of 51-60 indicates "[m]oderate symptoms [or] moderate difficulty in social, occupational, or school functioning." DSM-IV-TR at 34.

[23] Ketoprofen is a nonsteroidal anti-inflammatory cream. Saunders at 390.

On September 16, 2003, Dr. Blevins completed a physical evaluation on the plaintiff (tr 357-67) and he opined that she had a normal range of motion in her cervical and dorsolumbar spine, shoulders, elbows, hips, knees, ankles, wrists, hands, and fingers. (Tr. 365-66.) Dr. Blevins diagnosed the plaintiff with cervical disc disease with persistent radicular pain, musculoskeletal pain disorder, fibromyalgia, decreased grip strength of the upper left extremity, chronic pain syndrome, and depression. (Tr. 363.) Dr. Blevins also opined that she could occasionally lift less than 15 pounds, stand two hours per day, and sit four hours per day. *Id.*

On September 19, 2003, Alison Y. Kirk, Ph.D., a DDS consultant, completed a Psychiatric Review Technique Form ("PRTF") on the plaintiff (tr. 368-80) and found no medically determinable impairment, "no mental impairment alleged," and nothing "relevant to a mental disorder." (Tr. 368.) On September 23, 2003, Dr. Helena Perry, a non-examining consultative physician, who appears to have been a pediatrician (tr. 485), completed a physical Residual Functional Capacity ("RFC") Assessment on the plaintiff (tr. 381-87) and determined that she could occasionally lift/carry 20 pounds, frequently lift/carry 10 pounds, and stand/walk or sit for about six hours in an eight-hour workday. (Tr. 382.) Dr. Perry opined that the plaintiff was occasionally able to climb ramps and stairs, balance, stoop, kneel, crouch, and crawl but never climb ropes or ladders. (Tr. 384.) She also noted that the plaintiff was limited in her ability to push, pull, and reach with her left upper extremity, and found Dr. Blevins' physical evaluation to be "too restrictive for objective findings and phys[ical] exam." (Tr. 382-83, 384, 387.)

Between September and February of 2004, Dr. Freels examined the plaintiff several times, noted that her November 2003 EMG/NCV studies were normal, and performed left shoulder

arthroscopic surgery,[24] which significantly improved her range of motion and decreased her pain, although he noted that she did have degenerative disc disease post-surgery. (Tr. 388-90, 397-98, 400-01, 488.) Dr. Blevins examined the plaintiff in January and February of 2004, determined that she had "some improvement" from her left shoulder surgery (tr. 409), and noted that an MRI of her cervical spine revealed degenerative changes with some cervical disc impingement and that an MRI of her thoracic spine was normal. (Tr. 406.)

On March 19, 2004, the plaintiff presented to Dr. Ralph Hobbs at the Primary Care and Pain Relief Center with complaints of neck, left wrist, and shoulder pain. (Tr. 554-58.) The plaintiff reported that her pain level was a 9 out of 10 without medication and a 2-3 out of 10 with medication. (Tr. 554.) She stated that her pain medication helped control her pain and allowed her to be more active, do limited household chores, and crochet. *Id.* The plaintiff continued monthly examinations at the Primary Care and Pain Relief Center until March 19, 2005. (Tr. 516-58.)

On May 6, 2004, the plaintiff presented to Dr. Philip Rosenthal, a neurosurgeon, with complaints of neck pain. (Tr. 489.) Dr. Rosenthal reviewed the plaintiff's MRIs from February and noted that she had some changes in her cervical spine and a normal thoracic spine, but concluded that the results were "unrevealing" and did not recommend any surgical treatment. (Tr. 491.)

Dr. Blevins examined the plaintiff on August 25, 2004, and opined that "a cervical myelogram and CT with contrast of the c-spine" revealed some degenerative changes, but he did not believe that surgery was necessary. (Tr. 504.) Between August of 2004 and February of 2005,

---

[24] The surgery included debridement of undersurface of her rotator cuff and labrum, Bankart repair, and subacromial depression. (Tr. 388.)

he examined the plaintiff on a monthly basis.[25] (Tr. 496-504.) On March 5, 2005, Dr. Blevins completed a Medical Source Statement of Ability to do Work-Related Activities ("Medical Source Statement") on the plaintiff and opined that she could lift 10 pounds occasionally and less than 10 pounds frequently, stand/walk at least two hours and sit less than six hours in an eight-hour workday, and her ability to push and pull was limited. (Tr. 492-93.) Dr. Blevins also opined that the plaintiff could only occasionally climb, balance, kneel, crouch, crawl, and stoop, was limited in all of her manipulative functions, and had several environmental limitations. (Tr. 493-95.)

The plaintiff returned to Dr. Freels on June 29, 2005, for an MRI and CT scan of her cervical spine and an MRI of her left wrist. (Tr. 574-77.) The CT scan revealed "anterior cervical fusion at C5-6" and "mild to moderate central canal stenosis at C4-5 with right neural foraminal narrowing at C4-5 and C3-4." (Tr. 574.) The MRI of the plaintiff's cervical spine showed disc protrusion at C6-7, moderate central canal stenosis with bilateral neural foraminal narrowing at C4-5, and a small central disc protrusion at C3-4. (Tr. 575.) The MRI of the plaintiff's left wrist revealed "no evidence of dislocation or abnormal alignment" and was "essentially unremarkable." (Tr. 576.) On July 8, 2005, an MRI of the plaintiff's left wrist revealed "an instability with the lunate and the capitate with dorsiflexion" and a broken lateral axial but "[n]o evidence of abnormality of the scapholunate ligament," and an MRI and arthroscopy of her left elbow were normal. (Tr. 578-83.)

The plaintiff presented to Dr. Michael Moore, an orthopedic surgeon, on July 11, 2005, with complaints of left elbow and wrist pain. (Tr. 591-93.) Dr. Moore noted that the plaintiff had some irritation at the ulnar groove of her elbow but had a good functional range of motion in her neck,

[25] Dr. Blevins' treatment notes for this examination period are largely illegible. (Tr. 496-504.)

shoulder, and wrist. (Tr. 593.) He also concluded that she had post cervical laminectomy, chronic cervical and shoulder myofascial pain, and possible instability in her ankle ligaments. *Id.* On the same day, Dr. Freels examined the plaintiff and reviewed the results of her x-rays. (Tr. 596.) He diagnosed her with a wrist ligament tear and recommended that she wear a wrist brace. *Id.* The plaintiff reported that she would rather proceed with a surgical option (*id.*), and on July 26, 2005, the plaintiff underwent a left wrist arthroscopy. (Tr. 587.) On August 4, 2005, the plaintiff returned to Dr. Freels for a follow up examination and reported that she was "doing pretty good" and that her medication was helping her. (Tr. 594.)

On August 1, 2005, the plaintiff deposed Dr. Blevins (tr. 562-73), who testified that she had cervical disc disease and degenerative arthritis that caused chronic pain. (Tr. 567.) Dr. Blevins opined that the plaintiff met the requirements for Listing 1.04 since she had a herniated nucleus pulposus, spinal stenosis, and foraminal narrowing. (Tr. 568.) He also testified the plaintiff had a history of nerve root impingement prior to her surgery even though her CT scans and MRIs did not reveal it. *Id.* However, Dr. Blevins testified that the plaintiff did not meet Listing 1.08 because her condition involved bone and not soft tissue. (Tr. 569.) He opined that the plaintiff's condition corresponded more closely to Listing 1.07, since it was similar to a fracture involving a bony injury, but stated that her impairment involved the small carpal bones which were not addressed by Listing 1.07. (Tr. 569-70.)

On September 19, 2005, Ms. Matthews completed a second mental evaluation of the plaintiff (tr. 601-06) and noted that the plaintiff seemed in a depressed mood but was cooperative and fully oriented. (Tr. 601-03.) Ms. Matthews reported that the plaintiff did not show signs of malingering and diagnosed her with chronic Posttraumatic Stress Disorder ("PTSD"), stemming from an incident

of sexual molestation when she was a child, and depressive disorder, but she was unable to determine whether it was "primary or due to a medical condition." (Tr. 604-05.) She assigned the plaintiff a GAF score of 48[26] and opined that the plaintiff's ability to maintain social functioning, conduct activities of daily living, and understand, remember, and carry out detailed instructions were markedly limited and that her ability to adapt to changes in the work setting was moderately limited. (Tr. 605-09.) Ms. Mathews also determined that the plaintiff had deficiencies with her concentration and "repeated" to "continual" episodes of deterioration or decompensation.[27] (Tr. 609.)

On September 27, 2006, the plaintiff deposed Dr. Freels (tr. 619-29), who testified that it was difficult to determine whether she met Listing 1.04. (Tr. 625-26.) Dr. Freels reported that the plaintiff did not have a herniated nucleus pulposus or any obvious motor loss. *Id.* Dr. Freels also testified that, although he did not understand all the requirements of Listings 1.07 and 1.08, he concluded that the plaintiff's wrist injury met Listing 1.08. (Tr. 627.)

On October 30, 2006, the plaintiff presented to Dr. Linda Blazina, Ph.D., a consultative psychologist (tr. 637-43), and reported that she cooks daily with some assistance from her mother, can drive without difficulty, shops for groceries, attends church, and takes care of a pet. (Tr. 640.) She also stated that she is unable "to sit in a chair without support" or talk on the phone for lengthy periods of time and has difficulty maintaining concentration. *Id.* Dr. Blazina diagnosed the plaintiff with depressive disorder, found her to be unlimited in her ability to understand and remember, and assigned her a GAF score of 60. (Tr. 642.) Dr. Blazina determined that the plaintiff's ability to

---

[26] A GAF score of 41-50 indicates "[s]erious symptoms [or] serious impairment in social, occupational, or school functioning." DSM-IV-TR at 34.

[27] Ms. Mathews did not provide specifics for any episodes of decompensation.

understand and remember was not limited but that her depression and chronic pain moderately limited her ability to sustain concentration and persistence and moderately to severely limited her ability to socially interact with others and adapt to changes in a work setting. (Tr. 642, 645.)

### B.  Hearing Testimony from September 26, 2005: The Plaintiff and The Plaintiff's Friend[28]

The plaintiff's first hearing in this case was held on September 26, 2005, at which time she was represented by an attorney, and she and Teny Rule Fisher, her friend and minister, testified. (Tr. 662-703.)

The plaintiff testified that she received a graduate degree and lives with her mother. (Tr. 666-67.)  She related that she has a driver's license but is not able to drive long distances. (Tr. 668.)  The plaintiff testified that she worked for the local PBS station until she was involved in a car accident on September 25, 2002, and was no longer able to get in and out of businesses or carry the books that were required for her job. (Tr. 669-70.)  The plaintiff stated that on November 7, 2002, she began work as a bookkeeper at Custom Fireplace and More until she was fired on December 20, 2002. (Tr. 670.)  She related that after she was fired, she interviewed with a newspaper in Livingston, Tennessee, and tried to do odd jobs, such as yard work, but that she was not able to maintain employment. (Tr. 672.)  The plaintiff testified that her wrist surgeries limited her ability to crochet and needle point and that she was only able to "piddle in the yard." (Tr. 674.)

---

[28] An initial hearing was scheduled on July 22, 2005, at which time the plaintiff elected to postpone her hearing in order to obtain representation. (Tr. 651-61.)

The plaintiff testified that her main medical problems were her neck, left wrist, shoulder, and lower back pain. *Id.* She related that constipation, insomnia, vision problems, PTSD, and fibromyalgia were secondary medical conditions. (Tr. 675-76.)

After she received her master's degree in 1997, she worked for a "freebie newspaper," selling ads, and then for Crestlon Cemetery, as a funeral services consultant. (Tr. 677-79.) She related that she was fired from her job at Crestlon because of missing work to have surgeries and for not being able to carry heavy books or assist clients' families. (Tr. 679-80.) The plaintiff testified that she then worked for a PBS affiliate selling sponsorships, but resigned from that position after her car accident in September of 2002. (Tr. 681-82.) The plaintiff stated that she next worked as a bookkeeper at Custom Fireplaces and More, but was fired for making multiple mistakes. (Tr. 683-86.) The plaintiff testified that she could not return to her previous job as an ad salesperson because of her inability to lift books, focus, and "get things right." (Tr. 687.)

The plaintiff related that her back injury causes constant pain and that her discomfort is relieved by lying down in a bed, taking medication, or using a cushion for support. (Tr. 690-92.) She also attributed her depression to her constant pain and lack of an active lifestyle. (Tr. 693.)

Ms. Fisher testified that she had known the plaintiff since 1992, and reported that over the last year she had seen the plaintiff 20 or 30 times at church. (Tr. 698-99.) Ms. Fisher described the plaintiff as an active person before her surgeries and explained that her condition has become more debilitating over the years. (Tr. 699.) Ms. Fisher testified that her church had purchased a special chair for the plaintiff so she could attend the sermons in comfort. (Tr. 700.)

**C. Hearing Testimony from January 19, 2007: The Plaintiff, the Medical Expert, and the Vocational Expert**

The plaintiff's second hearing was held on January 19, 2007, at which time she was represented by an attorney, and she, Dr. William Clayton, a Medical Expert ("ME"),[29] and Dr. Julian Nadolsky, a Vocational Expert ("VE"), testified. (Tr. 704-70.)

The plaintiff testified that, at the time of this hearing, she was in a trial period for work as a traveling salesperson and that she had driven to North Carolina for job training. (Tr. 712-13.) She related that she had occasionally helped clean her church, which involved vacuuming, dusting and cleaning toilets, that within the past year she had driven to New York, and that she enjoys "goofing off on the computer." (Tr. 714-16.) The plaintiff stated that she was depressed because she was in pain every day but that her depression, on its own, would not preclude her from working. (Tr. 727-28.) She testified that she was not receiving treatment for her depression but that Dr. Blevins had prescribed her Xanax to help her sleep. (Tr. 728-29.) The plaintiff also related that she suffers from fainting spells but that she had not received a diagnosis for this condition. (Tr. 729-30.)

The ME[30] testified that after reviewing the plaintiff's medical records, he found that her complaints of pain exceeded "what the average person with her objective findings would have." (Tr. 740-42.) The ME related that he disagreed with Dr. Freels who opined that the plaintiff met or equaled Listing 1.08, because although, she had multiple surgeries on her upper left extremity, the limitations on the use of her shoulder and wrist after each surgery lasted only for a few weeks.

---

[29] Apparently, the ALJ conducted the hearing by video inasmuch as the ALJ was in Knoxville and the plaintiff and her counsel were in Cookeville. Docket Entry No. 12, at 2. Dr. Clayton testified telephonically from another location. (Tr. 706.)

[30] The ME was a board eligible but not board certified orthopedic surgeon, who had not performed any surgery since 1992. (Tr. 749-50.)

(Tr. 744.)  He also testified that the plaintiff's objective medical records do not indicate that she met or equaled Listings 1.04 or 1.07. (Tr. 744-45.)

The ME testified that based on the objective medical records, the plaintiff would be able to perform work at the sedentary level. (Tr. 747-48.)  The ME explained that the plaintiff would be able to lift, push, or pull "no more than 10 pounds occasionally or frequently and that would be mostly with her right arm and not her left" since she could not lift more than five pounds with her left arm. (Tr. 748.)  Additionally, he related that  the plaintiff could not use her left arm or hand above her shoulder or do any repetitive work with her left hand, but that she would have no difficulty standing or walking. (Tr. 748-49.)

The VE classified the plaintiff's previous jobs as a bookkeeper as sedentary and semi-skilled, as an account executive and advertising salesperson as light and semi-skilled, and as a coordinator of a satellite research center as light and "possibly skilled." (Tr. 762.)  The ALJ asked the VE what type of work the plaintiff could perform if she were limited to light exertion, could lift no more than a total of 10 pounds using both upper extremities, could lift no more than five pounds with the non-dominant upper extremity, could not perform repetitive pulling or pushing with the upper extremities, and could not use the left upper extremity for working overhead. (Tr. 762-63.)  The VE responded that the plaintiff would be able to perform her past relevant work as a bookkeeper and other unskilled jobs, such as a sales clerk, cashier, or gate tender. (Tr. 763-65.)

The ALJ then asked the VE if the plaintiff would be able to maintain employment if she were unable to perform the exertional demands of an eight-hour work day, such as sitting, standing, walking, lifting, carrying, pushing, and pulling. (Tr. 763.)  The VE responded that there would be no jobs available for the plaintiff unless a job were designed specifically for her. *Id.*  The VE also

testified that if the plaintiff's complaints of pain were credible, then she would be precluded from being able to work. (Tr. 766.)

The plaintiff's attorney asked the VE if the plaintiff would be able to work as a bookkeeper if her concentration were moderately to markedly limited, and the VE answered that she would not be able to work as a bookkeeper. (Tr. 767.) The plaintiff's attorney then asked if any of the jobs mentioned would be eliminated if the plaintiff were moderately to markedly limited in her ability to interact with the public, and the VE responded that she would be precluded from some jobs but that many jobs wold still be available to her "that would not require her to deal with the public." *Id*. Next, the plaintiff's attorney asked the VE if the plaintiff could perform any work if she were moderately to markedly limited in her ability to "respond appropriately to changes in routine work settings." (Tr. 768.) The VE answered that the plaintiff would not be able to work but, if her ability to respond to changes at work were only moderately limited, she would be able to perform unskilled jobs. *Id.*

## III. THE ALJ'S FINDINGS

The ALJ issued an unfavorable decision on May 21, 2007. (Tr. 16-27.) Based on the record, the ALJ made the following findings:

1. The claimant meets the insured status requirements of the Social Security Act through September 30, 2007.

2. The claimant has not engaged in substantial gainful activity since February 28, 2000, the alleged onset date (20 CFR 404.1520(b), 404.1571 *et seq*., 416.920(b) and 416.971 *et seq*.).

\* \* \*

3.     The claimant has the following severe impairments: status-post C5-6 discectomy and fusion; mild to moderate degenerative changes in the cervical and lumbar spines; status-post multiple left shoulder arthroscopic surgeries, including a reconstruction; status-post left wrist arthroscopy secondary to partial ligament tear; and chronic pain syndrome (20 CFR 404.1520(c) and 416.920(c)).

* * *

4.     The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

* * *

5.     After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to lift and carry up to 10 pounds with both hands, but no more than 5 pounds with the non-dominant left upper extremity, and sit, stand, or walk for about 6 hours each out of an 8 hour day.  The claimant cannot perform any repetitive pushing or pulling with the arms and cannot use her left arm for overhead work.

* * *

6.     The claimant is capable of performing past relevant work as a bookkeeper.  This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565 and 416.965).

* * *

7.     The claimant has not been under a disability, as defined in the Social Security Act, from February 28, 2000 through the date of this decision (20 CFR 404.1520(f) and 416.920(f)).

(Tr. 18-26.)

# IV. DISCUSSION

## A. Standard of Review

The determination of disability under the Act is an administrative decision, and the only questions before this Court are whether the decision of the Commissioner is supported by substantial evidence and whether the Commissioner employed the proper legal standards in reaching his conclusion. 42 U.S.C. § 405(g). *See Richardson v. Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971) (adopting and defining substantial evidence standard in context of Social Security cases). The Commissioner's decision must be affirmed if it is supported by substantial evidence, "even if there is substantial evidence in the record that would have supported an opposite conclusion." *Blakely v. Comm'r of Soc. Sec.,* 581 F.3d 399, 406 (6th Cir. 2009) (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir.1997)); *Jones* v. *Comm'r of Soc. Sec.,* 336 F.3d 469, 477 (6th Cir. 2003); *Her v. Comm'r of Soc. Sec.,* 203 F.3d 388, 389-90 (6th Cir. 1999). Substantial evidence is defined as "more than a mere scintilla" and "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 401 (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S. Ct. 206, 83 L. Ed. 126 (1938)); *Rogers v. Comm'r of Soc. Sec.,* 486 F.3d 234, 241 (6th Cir. 2008); *Le Master v. Weinberger*, 533 F.2d 337, 339 (6th Cir. 1976) (quoting Sixth Circuit opinions adopting language substantially similar to that in *Richardson*).

A reviewing court may not try the case *de novo*, resolve conflicts in evidence, or decide questions of credibility. *See, e.g., Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984) (citing *Myers v. Richardson*, 471 F.2d 1265, 1268 (6th Cir. 1972)). The Court must accept the ALJ's explicit findings and determination unless the record as a whole is without substantial evidence to

support the ALJ's determination. 42 U.S.C. § 405(g). *See, e.g., Houston v. Sec'y of Health & Human Servs.*, 736 F.2d 365, 366 (6th Cir. 1984).

The Commissioner must employ a five-step evaluation process in determining the issue of disability. *See, e.g., Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001) (citing *Abbot v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990)). The original burden of establishing disability is on the plaintiff, and impairments must be demonstrated by medically acceptable clinical and laboratory diagnostic techniques. *See* 42 U.S.C. § 1382c(a)(3)(D); 20 C.F.R. §§ 404.1512(a), (c), 404.1513(d). First, the plaintiff must show that she is not engaged in "substantial gainful activity" at the time she seeks disability benefits. *Heston*, 245 F.3d at 534 (citing 20 C.F.R. §§ 404.1520(b), 416.920(b)); *Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 539 (6th Cir. 2007). A plaintiff who is performing substantial gainful activity is not disabled no matter how severe her medical condition may be. *See, e.g., Dinkel v. Sec'y of Health & Human Servs.*, 910 F.2d 315, 318 (6th Cir. 1990).

Second, the plaintiff must show that she suffers from a "severe impairment." A "severe impairment" is one which "significantly limits . . . physical or mental ability to do basic work activities." *Id.* (citing 20 C.F.R. §§ 404.1520(c), 416.920(c)). Basic work activities are "the abilities and aptitudes necessary to do most jobs," such as "walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; [c]apacities for seeing, hearing, and speaking; [u]nderstanding, carrying out, and remembering simple instructions; [u]se of judgment; [r]esponding appropriately to supervision, co-workers and usual work situations; and [d]ealing with changes in a routine work setting." 20 C.F.R. § 404.1521(b). The Commissioner is required to consider the combined effects of impairments that individually are not severe but cumulatively may constitute a severe impairment. 42 U.S.C. § 423(d)(2)(B); *Foster v. Bowen*, 853 F.2d 483, 490 (6th Cir. 1988).

Third, if the plaintiff is not engaging in substantial gainful activity and is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and her impairment meets or equals a listed impairment, she is presumed disabled without further inquiry, regardless of age, education or work experience. *Id.* (citing 20 C.F.R. §§ 404.1520(d), 416.920(d)). The plaintiff may establish that she meets or equals a listed impairment, and that the impairment has lasted or is expected to last for at least twelve months or result in death. *See Listenbee v. Sec'y of Health & Human Servs.*, 846 F.2d 345, 350 (6th Cir. 1988). The plaintiff is not required to show the existence of a listed impairment in order to be found disabled, but such a showing results in an automatic finding of disability. *See Blankenship v. Bowen*, 874 F.2d 1116, 1122 (6th Cir. 1989).

Fourth, if the plaintiff's impairment does not prevent her from doing her past relevant work, she is not disabled. *Id.* The plaintiff has the burden of proving inability to perform past relevant work, or proving that a particular past job should not be considered relevant. *Cruse*, 502 F.3d at 539; *Jones*, 336 F.3d at 474 ("Through step four, the [plaintiff] bears the burden of proving the existence and severity of limitations caused by her impairments and the fact that she is precluded from performing her past relevant work."); *Smith v. Sec'y of Health & Human Servs.*, 893 F.2d 106, 109 (6th Cir. 1989). If the plaintiff fails to carry this burden, she must be denied disability benefits.

Once the plaintiff establishes a *prima facie* case that she is unable to perform her prior relevant employment, the burden shifts in step five to the Commissioner to show that the plaintiff can perform other substantial gainful employment, and that such employment exists in the national economy. *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005); *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994). To rebut a *prima facie* case, the Commissioner must come

forward with proof of the existence of other jobs a plaintiff can perform. *Longworth*, 402 F.3d at 595. *See also Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524, 528 (6th Cir. 1981), *cert. denied*, 461 U.S. 957, 103 S.Ct. 2428, 77 L.Ed.2d 1315 (1983) (upholding the validity of the medical-vocational guidelines grid as a means for the Commissioner of carrying his burden under appropriate circumstances). It remains the plaintiff's burden to prove the extent of her functional limitations. *Her*, 203 F.3d at 391. Even if the plaintiff's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that the plaintiff can perform, she is not disabled.[31] *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 652 (6th Cir. 2009); *Her*, 203 F.3d at 391. *See also Tyra v. Sec'y of Health & Human Servs.*, 896 F.2d 1024, 1028-29 (6th Cir. 1990); *Farris v. Sec'y of Health & Human Servs.*, 773 F.2d 85, 88-89 (6th Cir. 1985); *Mowery v. Heckler*, 771 F.2d 966, 969-70 (6th Cir. 1985).

If the question of disability can be resolved at any point in the sequential evaluation process, the claim is not reviewed further. 20 C.F.R. § 404.1520(a)(4). *See also Higgs v. Bowen*, 880 F.2d 860, 863 (6th Cir. 1988) (resolution of plaintiff's claim at step two of the evaluative process is appropriate in some circumstances).

### B. The Five-Step Inquiry

In this case, the ALJ resolved the case at step four of the five-step process. (Tr. 26.) At step one, the ALJ found that although the plaintiff had recently returned to work as a traveling salesperson, she had not yet worked there for more than three months and therefore had not engaged

---

[31] This latter factor is considered regardless of whether such work exists in the immediate area in which the plaintiff lives or whether a specific job vacancy exists or whether the plaintiff would be hired if she applied. *Ragan v. Finch*, 435 F.2d 239, 241 (6th Cir. 1970).

in substantial gainful activity since February 28, 2000, the alleged onset date of disability. (Tr. 18-19.)  At step two, the ALJ determined that the plaintiff's diskectomy and fusion, degenerative changes in the cervical and lumbar spines, left shoulder surgeries, left wrist partial ligament tear, and chronic pain syndrome were severe impairments. (Tr. 19.)  At step three, the ALJ found that the plaintiff's impairments, either singly or in combination, did not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4. (Tr. 23.)  At step four, the ALJ concluded that the plaintiff was able perform her past relevant work as a bookkeeper. (Tr. 26.)

**C.  Plaintiff's Assertions of Error**

The plaintiff contends that the ALJ erred in finding that the plaintiff did not meet Listing 1.08 and by failing to give "good reasons" for the weight he assigned to Dr. Freels' medical opinion. Docket Entry No. 12, at 12-18.  The plaintiff also argues that substantial evidence does not support the ALJ's conclusion that she does not suffer from a severe mental impairment and that he failed to properly analyze her subjective complaints of pain. Docket Entry No. 12 at 18-22.

**1.  The ALJ properly determined that the plaintiff did not meet Listing 1.08.**

The plaintiff contends that the ALJ erred in concluding that she did not meet or medically equal Listing 1.08. Docket Entry No. 12 at 12-16.  The plaintiff has the burden of proof at steps one through four of the sequential disability benefits analysis, including proving presumptive disability by meeting or exceeding a Medical Listing at step three. *Little v. Astrue*, 2008 WL 3849937, at *4 (E.D. Ky. Aug. 15, 2008) (citing *Her*, 203 F.3d at 391).  Thus, the plaintiff has the burden of proof at step three to demonstrate "that [she] has or equals an impairment listed in 20 C.F.R., part 404, subpart P, appendix 1.'" *Little*, 2008 WL 3849937, at *4 (quoting *Arnold v. Comm'r of Soc. Sec.*,

238 F.3d 419, 2000 WL 1909386, at *2 (6th Cir. Dec. 27, 2000)). It is essential for the plaintiff's impairment to meet all of the listing's specified medical criteria since "[a]n impairment that manifests only some of those criteria, no matter how severely, does not qualify." *Sullivan v. Zebley*, 493 U.S. 521, 530 110 S.Ct. 885, 107 L.Ed.2d. 967 (1990); *Lawson v. Comm'r of Soc. Sec.*, 192 Fed. Appx. 521, 529, 2006 WL 2430991 (6th Cir. Aug. 22, 2006). If the plaintiff does sufficiently demonstrate that her impairment meets or equals a listed impairment, the ALJ must find the plaintiff disabled. *Little*, 2008 WL 3849937, at *4 (citing *Buress v. Sec'y of Health & Human Servs.*, 835 F.2d 139, 140 (6th Cir. 1987)).

> According to Listing 1.08, a person will be found disabled if she has a
>
> *[s]oft tissue injury (e.g., burns)* of an upper or lower extremity, trunk, or face and head, under continuing surgical management, as defined in 1.00M, directed toward salvage or restoration of major function, and such major function was not restored or expected to be restored within 12 months of onset. . . .

20 C.F.R., Pt. 404, Subpt. P, App. 1, § 1.08. The plaintiff satisfies the first part of Listing 1.08 because she has been found to have a soft tissue injury in her left upper extremity. (Tr. 400, 596, 627.) The second element of Listing 1.08 requires evidence of "continuing surgical management," which the Regulations define as

> surgical procedures and any other associated treatments related to the efforts directed toward the salvage or restoration of functional use of the affected part. It may include such factors as post-surgical procedures, surgical complications, infections, or other medical complications, related illnesses, or related treatments that delay the individual's attainment of maximum benefit from therapy. . . .

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.00M. The Sixth Circuit has explained that "[t]he focus of [Listing 1.08] is the disabling effect of the surgical procedures, not the pain and inconvenience associated with the soft tissue injury itself." *Cooper v. Sullivan*, 902 F.2d 32, 1990 WL 61117, at *2-3 (6th Cir. May 8, 1990). The necessary functional loss that is required by Listing 1.08, as

defined by the Regulations, includes the "inability to perform fine and gross movements effectively . . . [which] must have lasted, or be expected to last for at least 12 months." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.00(B)(2)(a). The Regulations describe the "inability to perform fine and gross movements effectively" as being the

> extreme loss of function of both upper extremities; *i.e.*, an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities. To use their upper extremities effectively, individuals must be capable of sustaining such functions as reaching, pushing, pulling, grasping, and fingering to be able to carry out activities of daily living. Therefore, examples of inability to perform fine and gross movements effectively include, but are not limited to, the inability to prepare a simple meal and feed oneself, the inability to take care of personal hygiene, the inability to sort and handle papers or files, and the inability to place files in a file cabinet at or above waist level.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.00(B)(2)(c).

The plaintiff underwent a series of surgeries on her left upper extremity, most of which were diagnostic arthroscopies (tr. 488, 578-83, 596), and she asserts that her shoulder, elbow, and wrist soft tissue injuries meet Listing 1.08. Docket Entry No. 12, at 13-14. In 2000, Dr. Brown performed two surgical procedures on the plaintiff's left shoulder (tr. 313-16); in November of 2003, Dr. Freels performed surgery on the plaintiff's left shoulder to repair small labral tears (tr. 398-90); on July 8, 2005, the plaintiff had an arthroscopy of her left elbow (tr. 582); and on July 26, 2005, Dr. Freels performed a "[l]eft wrist arthroscopy with partial synovectomy" and a debridement of a ligament tear on the plaintiff. (Tr. 587-89.) The plaintiff acknowledged that her shoulder surgery in 2003 "relieved the symptoms in her left shoulder" but did not reduce her elbow or wrist pain, thus the focus of whether the plaintiff met Listing 1.08 relates to her elbow and wrist surgeries. Docket Entry No. 17, at 2.

Neither the plaintiff's elbow or wrist impairments meet Listing 1.08. The plaintiff's left elbow arthroscopy, performed on July 8, 2005, was for examination purposes and not to repair damage to the joint, and it revealed that her elbow was "[n]ormal." (Tr. 582.) Three days after this procedure, Dr. Moore noted that the plaintiff had some irritation in her left elbow (tr. 582), but from that point forward the record does not contain any evidence that there were any further examinations of or treatment for her left elbow. Since there is no evidence in the record that the plaintiff's left elbow was "under continuing surgical management" or that her elbow's "major function was not restored or expected to be restored within 12 months of onset," she does not meet Listing 1.08. 20 C.F.R., Pt. 404, Subpt. P, App. 1, § 1.08.

The plaintiff also underwent a left wrist arthroscopy on July 26, 2005, to repair a torn ligament (tr. 587), and nearly one week after this procedure she reported that she was "doing pretty good" and that her pain medication was "helping quite a bit." (Tr. 594.) After the plaintiff's surgery and initial follow-up examination, there is no medical evidence in the record that indicates that she sought further treatment for her left wrist. However, the plaintiff points to the testimony of Dr. Blevins and Dr. Freels to show that she meets the Listing. Docket Entry No. 12, at 13-14. At his deposition on August 1, 2005, Dr. Blevins testified that it "wouldn't be unexpected to me for [the plaintiff's wrist impairment] to last 12 months" (tr. 570), and, at his deposition on September 27, 2006, Dr. Freels testified that the plaintiff's wrist surgery had failed to give her symptomatic relief and that the major function of her wrist was "probably not going to be restored for at least 12 months." (Tr. 627-28.)

Dr. Blevins, the plaintiff's family practitioner, testified less than one week after the plaintiff's left wrist surgery and, when he was asked how long he expected her left wrist impairment

to last, he answered that "it would be more appropriate for the orthopedic surgeon to answer [that question]." (Tr. 570.)  Dr. Blevins did not conclude that the plaintiff would have functional loss of her left wrist for 12 months; rather he testified that it "wouldn't be unexpected to [him]" for "some impairment" of her wrist to last 12 months and that his "experience with [the plaintiff] is that this is a long-term problem and [he had] concern that it will ever totally resolve." *Id.*  The plaintiff's reliance on Dr. Blevins' testimony to meet Listing 1.08 is further undercut by his testimony that her left wrist condition "involves bone, which is not soft tissue," which does not fulfill the requirements of the Listing. (Tr. 569.)

On September 27, 2006, Dr. Freels testified that the plaintiff had not received symptomatic relief from her left wrist surgery and that the "little small bones in her wrist aren't moving like they should." (Tr. 627.)  Yet, he also testified that the last time he examined the plaintiff was in December of 2005, five months after her surgery, and that he recommended she undergo a second surgery to surgically reconstruct her wrist ligament to prevent arthritis. (Tr. 627.)  Dr. Freels testified that the major functioning of the plaintiff's wrist would not be restored for 12 months "[u]ntil she has that surgery." (Tr. 627-28.)  His testimony indicates that there was a surgical procedure that could have restored the functional ability of the plaintiff's left wrist and that she was made aware of this procedure but chose not to follow Dr. Freels' recommendation. *Id.*

Even though Dr. Freels related that major functioning had not been restored in the plaintiff's left wrist, the plaintiff's own testimony indicates that she is able "to perform fine or gross movements effectively." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.00(B)(2)(a).  The Regulations offer some examples of the inability to perform fine and gross movement: "the inability to prepare a simple meal and feed oneself, the inability to take care of personal hygiene, the inability to sort and

handle papers or files, and the inability to place files in a file cabinet at or above waist level." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.00(B)(2)(c). The plaintiff testified that she was able to crochet, needlepoint, pull weeds, cut flowers, occasionally attend church, dust, do laundry, and recently drive herself to North Carolina and to New York in 2006. (Tr. 674, 698, 712-14.) The plaintiff also reported to Dr. Blazina that she was able to "complete her self-care skills without assistance and her hygiene was adequate at the time of the evaluation," shop for groceries, cook, and "drive without difficulty." (Tr. 640.) The plaintiff's activities indicate that she was still able "to perform fine and gross movement effectively" as detailed in 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.00(B)(2)(c).

Finally, the ALJ relied on the testimony of Dr. Clayton, a ME and orthopedist, who related that the plaintiff's impairments did not meet or medically equal any listed impairment. (Tr. 23, 743-48.) After reviewing the plaintiff's medical records, Dr. Clayton concluded that there was "not enough objective medical evidence to say . . . that function was not restored." (Tr. 747.) The plaintiff argues that the ALJ should not have relied upon Dr. Clayton as an expert (Docket Entry No. 12, at 14-16), but the Regulations provide that an ALJ "may ask for and consider opinions from medical experts on the nature and severity" of any of the plaintiff's impairments and whether those impairments equal "the requirements of any impairments in appendix 1." 20 C.F.R. §§ 404.1527(f)(2)(iii), 416.927(f)(2)(iii). *See also Hickson v. Astrue*, 2010 WL 2723714, at *8 (N.D. Ohio July 8, 2010) (citing *Richardson v. Perales*, 402 U.S. 389, 408, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971); *Buxton v. Halter*, 246 F.3d 762, 775 (6th Cir. 2001)).

The ALJ properly determined that the plaintiff did not meet Listing 1.08 by relying on Dr. Clayton's testimony, the lack of objective record medical evidence indicating that she was

unable to perform fine and gross movements effectively, and the plaintiff's own testimony and other reports of daily activities.

### 2. The ALJ provided good reasons for the weight he assigned to the opinions of the plaintiff's treating physicians.

The plaintiff contends that the ALJ erred in assigning "no weight" to the findings of Dr. Blevins and Dr. Freels that the plaintiff met a listed impairment. Docket Entry No. 12, at 16-18. From 1998 to 2004, Dr. Blevins treated the plaintiff on multiple occasions (tr. 357-67, 407-71), and from 2003 to 2006, Dr. Freels examined the plaintiff multiple times. (Tr. 388-403, 488, 594-600.) Given the frequency and regularity of the relationships of both doctors with the plaintiff, they are classified as treating sources under 20 C.F.R. § 404.1502.[32]

In determining a plaintiff's RFC, an ALJ is required to evaluate and weigh all medical evidence and opinions on record. 20 C.F.R. §§ 404.1527, 416.927. Medical opinions "are statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of [the plaintiff's] impairment(s), including [her] symptoms, diagnosis and prognosis, what [she] can still do despite impairment(s), and [her] physical or mental restrictions." 20 C.F.R. §§ 404.1527(a)(2), 416.927(a)(2). The Commissioner has established a

---

[32] A treating source, defined by 20 C.F.R. § 404.1502, is

> your own physician, psychologist, or other acceptable medical source who provides you, or has provided you, with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with you. Generally, we will consider that you have an ongoing treatment relationship with an acceptable medical source when the medical evidence establishes that you see, or have seen, the source with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for your medical condition(s).

hierarchy for the weight of medical opinion evidence: examining sources and treating sources are given more weight than non-examining sources, treating sources are given more weight than one-time examining sources, and specialists are given greater weight than generalists. 20 C.F.R. §§ 404.1527(d)(1)-(5), 416.927(d)(1)-(2).

Treating physicians are "the medical professionals most able to provide a detailed, longitudinal picture of [a claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from objective medical findings alone." 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2) . Generally, an ALJ is required to give "controlling weight" to the medical opinion of a treating physician, as compared to the medical opinion of a non-treating physician, if the opinion of the treating source is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." *Id.* This is commonly known as the treating physician rule. *See* Soc. Sec. Rul. 96-2p, 1996 WL 374188 (July 2, 1996); *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004).

Even if a treating source's medical opinion is not given controlling weight, it is "still entitled to deference and *must be weighed using all of the factors provided in 20 C.F.R. 404.1527 . . . .*" *Fisk v. Astrue*, 253 Fed. Appx. 580, 585 (6th Cir. Nov. 9, 2007) (quoting Soc. Sec Rul. 96-2p, 1996 WL 374188, at *4) (emphasis in original). The ALJ must consider

> (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship; (3) the supportability of the opinion with respect to relevant evidence such as medical signs and laboratory findings; (4) the consistency of the opinion with the record as a whole; (5) the specialization of the physician rendering the opinion; and (6) any other factor raised by the applicant.

*McGrew v. Comm'r of Soc. Sec.*, 343 Fed. Appx. 26, 30 (6th Cir. Aug. 19, 2009) (citing *Wilson*, 378 F.3d at 544); *Meece v. Barnhart*, 192 Fed. Appx. 456, 461 (6th Cir. Aug. 8, 2006) (quoting 20 C.F.R. § 404.1527(d)(2)-(6)).  The ALJ must also provide "good reasons" for the resulting weight given to the treating source. Soc. Sec Rul. 96-2p, 1996 WL 374188, at *5 (citing 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2)); *Brock v. Comm'r of Soc. Sec.*, 2010 WL 784907, at *2 (6th Cir. Mar. 8, 2010).  The "good reasons" must be "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." Soc. Sec Rul. 96-2p, 1996 WL 374188, at *5 (citing 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2)).

The ALJ focused on the factors of supportability and inconsistency in assigning "no weight" to Dr. Blevins' and Dr. Freels' medical opinions.  The ALJ explained:

> The undersigned assigns no weight to the extreme functional limitations assigned to the [plaintiff] by Dr. Blevins (who gave his deposition with the [plaintiff] present).  Said physician, along with Dr. Freels, her orthopedic surgeon, also opined that the [plaintiff's] impairments meet medical listings 1.04, 1.07, and 1.08.  Said opinions and assessments are wholly inconsistent with the [plaintiff's] objective scans and tests, clinical exam notes, and the findings of symptom exaggeration noted above.  They are also inconsistent with the [plaintiff's] reported daily activities, outlined below and the opinions of Dr. Clayton, the orthopedic medical expert.  Dr. Blevins has given inconsistent opinions as to the severity of the [plaintiff's] orthopedic problems.  As noted above, Dr. Blevins noted that the [plaintiff] was engaged in drug-seeking behavior.  In February 2003, he opined that her complaints of pain were "bizarre" and that she had no surgically significant problems.  However, three months later, he opined that she was totally disabled.  Also, Dr. Freels admitted that he was unsure of the requirements of Section 1.08.

(Tr. 25.)

While the plaintiff contends that the ALJ did not provide "good reasons" for discounting Dr. Blevins' and Dr. Freels' medical opinions, she specifically takes issue with the ALJ's decision to assign "no weight" to the testimony of Dr. Blevins and Dr. Freels regarding her ability to meet

a Listing. Docket Entry No. 12, at 17-18. As previously discussed, the ALJ did not err in discounting the testimony of Dr. Blevins and Dr. Freels, and he properly concluded that the plaintiff's elbow and wrist impairments did not meet Listing 1.08. The record evidence used to support the ALJ's conclusion that the plaintiff did not meet Listing 1.08 also supports his decision to assign "no weight" to Dr. Blevins' and Dr. Freels' medical opinions on whether the plaintiff met a listing. (Tr. 23, 25.)

The plaintiff deposed Dr. Blevins less than one week after her July 26, 2005, left wrist surgery and Dr. Freels 14 months after her surgery. (Tr. 562-73, 619-30.) Dr. Blevins testified that "it wouldn't be unexpected" for her wrist impairment to last more than 12 months, but he also testified that an orthopedic surgeon would be more qualified to determine how long her wrist impairment could last.[33] (Tr. 570.) Dr. Freels testified that her left wrist surgery had not provided her with symptomatic relief and that "little small bones in her wrist aren't moving like they should." (Tr. 627.) However, Dr. Freels also testified that the last time he had examined the plaintiff was five months after her wrist surgery and he recommended that she undergo a second surgery to restore the major functioning of her wrist. (Tr. 627-28.)

After the plaintiff's left wrist surgery, the record contains one treatment note from Dr. Freels and no treatment notes from Dr. Blevins. (Tr. 594.) The plaintiff presented to Dr. Freels nearly one week after her wrist surgery and reported that she was "doing pretty good." *Id.* He noted that the plaintiff had "good supination and pronation and dorsiflexion without eliciting any type of pain at all." *Id.* Dr. Freels told the plaintiff to avoid "heavy lifting, pulling, or pushing with her wrist" and

---

[33] It appears that Dr. Blevins last examined the plaintiff on February 21, 2005 (tr. 496), four months before her surgery.

recommended that she return for a follow-up examination in two months. *Id.* Although Dr. Freels testified that he last examined the plaintiff in December of 2005, the treatment notes from that visit are not in the record. Thus, there is only one post left wrist surgery treatment note from either Dr. Blevins or Dr. Freels to support their determinations that the plaintiff met Listing 1.8.

In addition to the lack of objective evidence supporting the medical opinions of Dr. Blevins and Dr. Freels, their findings were also inconsistent with other substantial evidence in the record. First, the plaintiff testified that she crochets, needlepoints, pulls weeds, cuts flowers, occasionally attends church, dusts, does laundry, and drove herself to North Carolina and to New York in 2006. (Tr. 674, 698, 712-14.) Dr. Blazina related that the plaintiff reported that she was able to "complete her self-care skills without assistance," shop for groceries "once or twice a month," cook daily with some assistance from her mother, attend church, and "drive without difficulty," and that the plaintiff displayed adequate hygiene. (Tr. 640.) Dr. Clayton testified that the plaintiff did not meet any listed impairment. (Tr. 743-48.) Dr. Clayton reviewed the plaintiff's medical records and concluded that there was "not enough objective medical evidence" in the record to show that function was not restored to her left wrist. (Tr. 744-47.)

In sum, the opinions of Dr. Blevins and Dr. Freels that the plaintiff satisfied the requirements of a listed impairment were not supported by their own treatment notes and were inconsistent with the evidence in the record. The record contains only one examination report from either Dr. Blevins or Dr. Freels after the plaintiff had left wrist surgery, the plaintiff's activities of daily living indicated that she was able to perform fine and gross movements with her left wrist, and Dr. Clayton, an orthopedist, concluded that objective medical evidence did not show that the plaintiff met a listed impairment. The ALJ provided "good reasons," as required by Soc. Sec Rul. 96-2p, 1996 WL

374188, at *5 (citing 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2)), for awarding "no weight" to the medical opinions of Dr. Blevins and Dr. Freels and substantial evidence in the record supports that determination.

### 3. The ALJ properly evaluated the severity of the plaintiff's mental impairments.

The plaintiff argues that the ALJ erred in assessing the severity of her mental impairments at step two in the five step sequential process.[34] Docket Entry No. 12, at 18-19. Specifically, the plaintiff contends that the ALJ erred in rejecting Ms. Mathews' and Dr. Blazina's mental health evaluations because of her "lack of mental health treatment or need for psychotropic medication." *Id.* at 19. *See* tr. 22-23. According to 20 C.F.R. § 404.1520(c), which codifies step two of the five step sequential process, an impairment is considered severe if that impairment "limits [the plaintiff's] physical or mental ability to do basic work activities."[35] *See also* 20 C.F.R. § 404.1521 ("An impairment or combination of impairments is not severe if it does not significantly limit [the plaintiff's] physical or mental ability to do basic work activities.") When assessing the severity of a plaintiff's mental impairment, the ALJ's written decision must include findings based upon a "special technique." 20 C.F.R. §§ 404.1520a(a).

The special technique is a series of steps delineated in subsections (b) through (e) of 20 C.F.R. § 404.1520a. First, the ALJ is required to evaluate the plaintiff's "pertinent symptoms, signs,

---

[34] The plaintiff did not specify the mental impairment that the ALJ failed to properly assess, but the record indicates that she was diagnosed with PTSD (tr. 604-05) and depression. (Tr. 604-05, 642.)

[35] The regulations define basic work activities as being the "abilities and aptitudes necessary to do most jobs." 20 C.F.R. § 404.1521(a).

and laboratory findings to determine whether [the plaintiff has] a medically determinable mental impairment(s)."[36] 20 C.F.R. § 404.1520a(b)(1). Next, the ALJ must assess the plaintiff's degree of functional limitation caused by the mental impairment. 20 C.F.R. §§ 404.1520a(b)(2). The regulations acknowledge the individualized nature of this step by requiring the ALJ "to consider multiple issues and all relevant evidence to obtain a longitudinal picture of [the plaintiff's] overall degree of functional limitation." 20 C.F.R. §§ 404.1520a(c)(1). Thus, the ALJ must "consider all relevant and available clinical signs and laboratory findings, the effects of [the plaintiff's] symptoms, and how [the plaintiff's] functioning may be affected by factors including, but not limited to, chronic mental disorders, structured settings, medication, and other treatment." *Id.*

After considering all the available relevant evidence, the ALJ must rate the plaintiff's functional limitation in the four following functional areas: activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation.[37] 20 C.F.R. § 404.1520a(c)(3). These four functional limitations are known as the "B" criteria. The term "B criteria" corresponds to the paragraph "B" criteria of the expansive list of mental disorders in 20 C.F.R. Pt. 404, Subpt. P, App. 1. The regulations require the ALJ to attach a point value to each of the four functional areas. 20 C.F.R. §§ 404.1520a(c)(4). For the first three categories, the regulations set forth a five-point assessment scale: none, mild, moderate, marked, and extreme. *Id.* The fourth category, episodes of decompensation, is rated with a four point scale: none, one or two,

---

[36] If the ALJ determines that the plaintiff has a medically determinable mental impairment, the ALJ must provide detailed support for such findings in accordance with 20 C.F.R. § 404.1520a(e).

[37] Decompensation is the "failure of defense mechanisms resulting in progressive personality disintegration." Dorland's Illustrated Medical Dictionary 478 (30th ed. 2003) ("Dorland's").

three, four or more. *Id.* "If the ALJ rates the first three functional areas as 'none' or 'mild' and the fourth area as 'none,' the impairment is generally not considered severe and the [plaintiff] is conclusively not disabled." *Rabbers v. Comm'r of Soc. Sec.,* 582 F.3d 647, 653 (6th Cir. 2009) (quoting 20 C.F.R. § 404.1520a(d)(1)).

The ALJ is also required to follow 20 C.F.R. § 404.1520a(e) in documenting the application of the special technique. The ALJ's written decision must include the germane findings and conclusions based on the special technique; show the plaintiff's significant history, such as medical examinations and laboratory findings, and the functional limitations considered in determining the severity of the plaintiff's mental impairments; and provide a specific finding regarding the level of the plaintiff's limitation in each of the four functional areas listed in 20 C.F.R. § 404.1520a(c)(3).[38] 20 C.F.R. § 404.1520a(e)(2).

The ALJ concluded that the plaintiff's depression and anxiety were not severe impairments because of her lack of mental health treatment or need for psychotropic medication, benign clinical exams, and "current work activity as a traveling salesperson." (Tr. 22-23.) The ALJ explained that he was

> cognizant of the [plaintiff's] allegations of depression and anxiety, as well as the diagnoses of same from Ms. Mathews, the psychologist to whom the [plaintiff] was recently referred by her attorney. However, the record does not indicate that the [plaintiff] has sought or required any treatment from mental health professionals or from her treating family physicians, none of whom reported that she exhibited significant affective distress. She admitted at the hearing that the only prescribed psychotropic she takes is to help her sleep. As to the recent diagnoses and severe functional limitations assigned to the [plaintiff] by Ms. Mathews, the undersigned

---

[38] Since 2000, the ALJ is no longer required to completed a Psychiatric Review Technique Form ("PRTF"). *Rabbers*, 582 F.3d at 653-54. The regulations only require that an ALJ's written decision "incorporate the pertinent findings and conclusions based on the [special] technique." *Id.* (quoting 20 C.F.R. § 404.1520a(e)(2)).

is unconvinced that the [plaintiff] has any severe mental impairment. Ms. Mathews' September 2005 diagnoses and functional assessment are completely inconsistent with her clinical findings and functional assessment of August 2003, wherein she opined that the [plaintiff] had no mental impairments at all. Given the extreme range of discrepancy between her opinions from the consultative exam requested by the Commissioner and the consultative exam requested by the [plaintiff's] attorney, along with the lack of any evidence in the record suggesting severe deterioration of the [plaintiff's] mental state in the interim, the undersigned is unwilling to assign any weight to her findings or conclusions. Additionally, the diagnoses and marked functional limitations assigned to the [plaintiff] by Dr. Blazina, the more recent psychological consultative examiner, are also wholly inconsistent with her lack of mental health treatment or prescribed psychotropics (for treatment of mental problems). They are unsupported by Dr. Blazina's own clinical observations and have been afforded no weight.

(Tr. 22.)

The above passage indicates that the ALJ did not properly address the "B" criteria in 20 C.F.R. § 404.1520a(c). The Sixth Circuit has recognized that "'[i]t is an elemental principle of administrative law that agencies are bound to follow their own regulations.'" *Rabbers*, 582 F.3d at 654 (quoting *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 545 (6th Cir. 2004)). *See also Morton v. Ruiz*, 415 U.S. 199, 235, 94 S.Ct. 1055, 39 L.Ed.2d 270 (1974) ("Where the rights of individuals are affected, it is incumbent upon agencies to follow their own procedures.") But the Sixth Circuit also applies the harmless error principle when reviewing administrative agency decisions in order to address situations in which remand would amount to nothing more than an "'idle and useless formality.'" *Rabbers*, 582 F.3d at 654 (quoting *NLRB v. Wyman-Gordon Co.*, 394 U.S. 759, 766 n. 6, 89 S.Ct. 1426, 22 L.Ed.2d 709 (1969), and citing *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001)).

In *Rabbers*, the Sixth Circuit made it very clear that a case should not be remanded for further administrative proceedings simply because an agency did not follow its procedures, unless "the [plaintiff] has been prejudiced on the merits or deprived of substantial rights because of the

agency's procedural lapses." 582 F.3d at 654 (quoting *Connor v. United States Civil Serv. Comm'n*, 721 F.2d 1054, 1056 (6th Cir.1983)). The Court then sought to clarify the type of agency procedure violation that would constitute "prejudice[] based on the merits" or a deprivation of substantial rights and whether noncompliance with 20 C.F.R. § 404.1520a is harmless error. *Rabbers*, 582 F.3d at 655.

The Court first discussed *Wilson*, noting that the Sixth Circuit has held that an ALJ's failure to provide "good reasons" for the weight he assigned to a treating physician's medical opinion is not harmless error and typically would require reversal and remand to the Commissioner. 582 F.3d at 655-56 (citing *Wilson*, 378 F.3d at 546.) In *Wilson,* the Court made an important distinction between regulations that grant procedural benefits to plaintiffs and regulations that are "'adopted for the orderly transaction of business before the [agency].'" 378 F.3d at 546 (quoting *American Farm Lines v. Black Ball Freight Serv.*, 397 U.S. 532, 538-39, 90 S.Ct. 1288, 25 L.Ed.2d 547 (1970) (alteration in original)). The Court in *Wilson* concluded that the reason-giving requirement of 20 C.F.R. § 404.1527(d)(2) was "an important procedural safeguard" put in place for the benefit of plaintiffs, and that it could not be discharged simply because evidence in the record supported the ALJ's rejection of the treating physician's opinion even though the end result would be the same after remand. *Wilson*, 378 F.3d at 547. Thus, an ALJ's failure to comply with the reason-giving requirement of 20 C.F.R. § 404.1527(d) was not harmless error. *Rabbers*, 582 F.3d at 656 (citing *Wilson*, 378 F.3d at 547).

In *Rabbers*, the Court found that *Wilson's* harmless error review had only been applied to the reason-giving requirement of 20 C.F.R. § 404.1527(d)(2) and declined to extend that application to 20 C.F.R. § 404.1520a. 582 F.3d at 656. The Court noted that the treating physician rule serves a very important role in the disposition of Social Security cases since a treating physician typically

has a long standing relationship with the plaintiff and is able to provide detailed accounts of the plaintiff's medical impairments. *Id.* A treating physician brings a unique perspective to the disability determination process when compared to objective medical findings or single medical examinations. *Id.* (citing 20 C.F.R. § 404.1527(d)(2)). In *Wilson*, the Court concluded that the good reason requirement was a procedural safeguard implemented to make sure the ALJ applied the treating physician rule. *Rabbers*, 582 F.3d at 656 (citing *Wilson*, 378 F.3d at 544). However, the *Rabbers* Court did not find that the "same rationale applie[d] in the context of an ALJ's failure to raise the B criteria." 582 F.3d at 656.

In *Rabbers*, the Court explained that requiring the ALJ to assign the B criteria a score is more of an "'adjudicatory tool'" put in place to aid the Social Security Administration ("SSA") in determining the severity of the plaintiff's mental impairment, whereas the good reason requirement was designed to provide an important procedural benefit to plaintiffs.[39] *Id.* (citing *Wilson*, 378 F.3d at 547). Furthermore, the Court noted that the treating physician rule helps a plaintiff understand the outcome of her case since the potential exists that the plaintiff's treating physician previously found her to be disabled and that a SSA ruling to the contrary would leave the plaintiff confused. 582 F.3d at 657 (citing *Wilson*, 378 F.3d at 547). Finally, the Court pointed out that it would be easier for a reviewing court to apply the B criteria and determine if the plaintiff's mental impairment would have satisfied the criteria than it would be for a reviewing court to determine what an ALJ's reasoning would be for discrediting a treating physician's medical opinion.[40] *Id.* Ultimately, the

[39] In *Rabbers*, the Court also pointed out that the language of 20 C.F.R. § 404.1520a "is worded in terms of the procedure's benefit to the SSA, not the [plaintiff]." 582 F.3d at 656.

[40] Specifically, the *Rabbers* Court noted that the "kind of evidence-evidence regarding the [plaintiff's] activities of daily living, social functioning, concentration, persistence, or pace, and

Court in *Rabbers* held that "the special technique of 20 C.F.R. § 404.1520a" should not be regarded as such an "'important procedural safeguard'" to a plaintiff that "an ALJ's failure to rate the B criteria will rarely be harmless.'" *Id.* (citing *Wilson*, 378 F.3d at 547). Thus, it is clearly evident from *Rabbers* that the Sixth Circuit is willing to apply the harmless error doctrine in cases addressing the special technique of 20 C.F.R. § 404.1520a.

The record medical evidence indicates that Ms. Mathews, a psychological examiner, first examined the plaintiff on August 19, 2003, and determined that she had no mental impairments and assigned her a GAF score of 60. (Tr. 353-55.) One month later, Dr. Kirk completed a PRTF on the plaintiff and also concluded that she had no medically determinable impairment. (Tr. 368.) The plaintiff returned to Ms. Mathews on September 19, 2005, for a second mental evaluation and she diagnosed her with PTSD and depressive disorder. (Tr. 604-05) Ms. Mathews assigned the plaintiff a GAF score of 48[41] and noted that the plaintiff's ability to maintain social functioning, conduct activities of daily living, and understand, remember, and carry out detailed instructions was markedly limited; that her ability to adapt to changes in the work setting was moderately limited; and that she had deficiencies with her concentration and "repeated" episodes of decompensation. (Tr. 605-09.) Ms. Mathews attributed the plaintiff's marked and moderate limitations to her pain and not to her depression. (Tr. 605.)

On October 30, 2006, the plaintiff presented to Dr. Blazina, a consultative psychologist, who diagnosed her with depressive disorder and opined that the plaintiff's ability to understand and

---

episodes of decompensation [the B criteria]-is objective, concrete[,] factual[,] and medical evidence that will be apparent in the record, at least in some cases." *Id.* at 657.

[41] A GAF score of 41-50 indicates "[s]erious symptoms [or] serious impairment in social, occupational, or school functioning." DSM-IV-TR at 34.

remember was not limited but that her depression and chronic pain moderately limited her ability to sustain concentration and persistence and moderately to severely limited her ability to socially interact with others and adapt to changes in a work setting. (Tr. 642, 645.)   She assigned the plaintiff a GAF score of 60. (Tr. 642.)

Both Ms. Mathews and Dr. Blazina diagnosed the plaintiff with depression and Ms. Mathews also opined that the plaintiff suffered from PTSD.  However, a "mere diagnosis . . . says nothing about the severity of the condition." *Higgs*, 880 F.2d at 863.  First, aside from the consultative evaluations of Ms. Mathews and Dr. Blazina, the record contains no evidence that the plaintiff was diagnosed with or received treatment for a mental impairment even though she was repeatedly examined by treating and non-treating physicians.  The only other mental evaluations of the plaintiff in the record, conducted by Dr. Kirk and Ms. Mathews in 2003, indicated that she did not have any mental impairments. (Tr. 353-55, 368-80.)  The plaintiff also testified that she was prescribed Xanax but that it was to help her sleep. (Tr. 728-29.)   In addition, Ms. Mathews largely attributed the moderate and marked limitations that she assigned to the plaintiff to her physical pain and not to her depression or PTSD. (Tr. 605.)  Finally, Dr. Blazina determined that the plaintiff was moderately limited in her ability to sustain concentration and persistence, and moderately to severely limited in interacting appropriately with the public, supervisors, and co-workers because of her pain and depression. (Tr. 642.)  However, her finding that the plaintiff was moderately to severely limited was inconsistent with the GAF score of 60 that she assigned the plaintiff since such a score denotes only moderate impairments. (Tr. 642, 645.). *See supra* n.22.

The plaintiff contends that the ALJ should not have rejected Ms. Mathews' and Dr. Blazina's mental health evaluations simply because of her "lack of mental health treatment or need for

psychotropic medication." Docket Entry No. 12, at 19. The plaintiff correctly points out that the Sixth Circuit has held that an individual with a serious mental disorder should not be penalized for failing to receive treatment since the mental disorder itself may cause the non-treatment seeking behavior. *Blankenship v. Bowen*, 874 F.2d 1116, 11124 (6th Cir. 1989). However, in determining that the plaintiff's mental impairment is not severe, the ALJ did not focus on the plaintiff's refusal to pursue treatment, but rather on the lack of diagnoses or record medical evidence that suggests the plaintiff's depression or PTSD significantly affected her ability "to do basic work activities." 20 C.F.R. § 404.1521. The plaintiff testified that she was able to participate in numerous daily activities, such as crocheting, needlepoint, pulling weeds and cutting flowers, attending church, dusting, driving, grocery shopping, and cooking (tr. 640, 674, 698, 712-14), and related that her depression, on its own, would not preclude her from working. (Tr. 727-28.)

Neither the plaintiff's testimony nor the record medical evidence indicates that the plaintiff's depression or PTSD significantly affected her activities of daily living; social functioning; or concentration, persistence, or pace. Even if the ALJ had made specific findings regarding the B criteria and had properly applied the special technique of 20 C.F.R. § 404.1520a, it is clear from the record that the plaintiff's depression was not a severe impairment to be considered at step two of the five step process. Thus, the ALJ's failure to properly follow 20 C.F.R. § 404.1520a in determining the severity of the plaintiff's depression is harmless error.

**4. Substantial evidence in the record supports the ALJ's finding that the plaintiff is not disabled due to pain.**

The plaintiff asserts that the ALJ failed to properly evaluate her subjective complaints of pain caused by degenerative disc disease, central canal stenosis of the cervical spine, and soft tissue injuries of her left upper extremity. Docket Entry No. 12 at 20-23. The ALJ found that

> [t]he cumulative effect of the [plaintiff's] hearing demeanor, the repeated clinical observations of malingering, psychological overlay, and drug-seeking behavior by numerous treating physicians, and her persistent incredible allegations of constant, intolerable pain, even without precipitating exertional activity or movement, are all indicative of an individual who is feigning symptoms.
>
> * * *
>
> After considering the evidence of record, the undersigned finds that the [plaintiff's] medically determinable impairments could reasonably be expected to produce some of the alleged symptoms, but that the [plaintiff's] statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible.

(Tr. 25-26.)

The ALJ is charged with evaluating the credibility of the plaintiff at the hearing, and the ultimate decision on credibility rests with the ALJ. The ALJ's credibility finding is entitled to deference "because of the ALJ's unique opportunity to observe the [plaintiff] and judge her subjective complaints." *See Buxton v. Halter*, 246 F. 3d 762, 773 (6th Cir. 2001) (internal citations omitted). However, "[i]f the ALJ rejects the claimant's complaints as incredible, he must clearly state his reason for doing so." *Wines v. Comm'r of Soc. Sec.*, 268 F. Supp.2d 954, 958 (N.D. Ohio 2003) (citing *Felisky*, 35 F. 3d at 1036).

Social Security Ruling 96-7p mandates that credibility determinations must find support in the record, and cannot be based merely upon the "intangible or intuitive notion[s]" of the ALJ. 1996 WL 374186 at *4. In determining the credibility of the plaintiff, the ALJ must consider the record as a whole, including the plaintiff's complaints, lab findings, information given by the treating

45

physicians, and other relevant evidence. *Id.* at *5. The ALJ must explain his credibility assessment such that both the plaintiff and subsequent reviewers will know the weight given to the plaintiff's statements and the reasoning for that weight. *Id.*

Both the SSA and the Sixth Circuit have enunciated guidelines for use in analyzing a plaintiff's subjective complaints of pain. *See* 20 C.F.R. § 404.1529; *Felisky*, 35 F.3d at 1037. While the inquiry into subjective complaints of pain must begin with the objective medical record, it does not end there. The Sixth Circuit in *Duncan v. Secretary of Health and Human Servs.*, 801 F.2d 847 (6th Cir. 1986), set forth the basic standard for evaluating such claims.[42] The *Duncan* test has two prongs. The first prong is whether there is objective medical evidence of an underlying medical condition. *Felisky*, 35 F.3d at 1039. The second prong has two parts: (1) whether objective medical evidence confirms the severity of the alleged pain arising from the condition, or (2) whether the objectively established medical condition is of such a severity that it can reasonably be expected to produce the alleged disabling pain. *Id.* This test does not require objective evidence of the pain itself. *Duncan*, 801 F.2d at 853 (quoting *Green v. Schweiker*, 749 F.2d 1066, 1071 (3rd Cir. 1984)).

There is objective medical evidence of the plaintiff's underlying degenerative disc disease and soft tissue injuries of her upper left extremity. (Tr. 334-35, 363, 388-90, 397-98, 400-01, 406, 427, 458, 488, 504, 574, 587.) Given that the second prong of the *Duncan* test consists of two alternatives, the plaintiff must only meet one of the following two elements: the objective medical evidence "confirms the severity of the alleged pain arising from the condition" or the "objectively established medical condition is of such a severity that it can reasonably be expected to produce the

---

[42] Although *Duncan* only applied to determinations made prior to 1987, the Sixth Circuit has since held that *Duncan* continues to apply to determinations made after 1987. *See Felisky*, 35 F.3d at 1039 n. 2.

alleged disabling pain." The SSA provides a checklist of factors to assess symptoms, including pain, in 20 C.F.R. § 404.1529(c). The ALJ cannot ignore a plaintiff's statements detailing the symptoms, persistence, or intensity of her pain simply because current objective medical evidence does not fully corroborate her statements. 20 C.F.R. § 404.1529(c)(2). Besides reviewing medical records to address the credibility of a plaintiff's symptoms of pain, an ALJ must review the entire case record in light of the seven factors set forth in 20 C.F.R. § 404.1529(c)(3).[43]

The ALJ determined that the plaintiff's subjective complaints of pain were inconsistent with the objective medical evidence in the record. (Tr. 24-26.) Both before and during the plaintiff's period of disability, multiple doctors indicated that her subjective complaints of pain did not align with their final diagnosis. Dr. Berkman opined that he had no explanation for the plaintiff's pain and could not longer offer any beneficial treatment to her (tr. 259); Dr. Stahlman noted that she "demonstrate[d] exaggerated pain behaviors and symptom magnification" and that she "has been evaluated by numerous physicians who have not uncovered anything which is addressable" (tr. 276); Dr. Brown found that even though she continued to complain of left shoulder pain, there was "no evidence on any studies that we have done to confirm/demonstrate any pathology that would explain the amount of pain she describes" (tr. 320); and Dr. Blevins stated that her pain complaints were "exquisite," "somewhat bizarre," and did not correlate with her MRI results. (Tr. 426-28) Further,

_____

[43] The seven factors under 20 C.F.R. § 404.1529(c)(3) include: (I) the plaintiff's daily activities, (ii) the location, duration, frequency, and intensity of the plaintiff's pain or other symptoms, (iii) precipitating and aggravating factors, (iv) the type, dosage, effectiveness and side effects of any medication the plaintiff takes or has taken to alleviate pain or other symptoms, (v) treatment, other than medication, plaintiff received or has received for relief of pain or other symptoms, (vi) any measures plaintiff uses or has used to relieve pain or other symptoms (e.g. lying flat on her back, standing for 15 to 20 minutes every hour, sleeping on a board, etc.), and (vii) other factors concerning plaintiff's functional limitations and restrictions due to pain or other symptoms. 20 C.F.R. § 404.1529(c)(3).

after reviewing the record medical evidence, Dr. Clayton, the ME, testified that the plaintiff's subjective complaints of pain were inconsistent with the objective medical evidence. (Tr. 742.)

In addition to the lack of objective medical evidence supporting the plaintiff's subjective complaints of pain, the plaintiff reported on several occasions that medication helped reduce her pain. A person's condition is not considered disabling if it can be relieved with medication. *Mullen v. Bowen*, 800 F.2d 535, 547-48 (6th Cir. 1986). During her treatment at Spectrum Pain Clinic in 2002 and 2003, the plaintiff consistently rated her pain between 3 to 9 out of 10 without medication and from 0 to 3 out of 10 with medication. (Tr. 345-49.) In 2004 and 2005, while receiving treatment at the Primary Care and Pain Relief Center, the plaintiff reported that her pain level was a 9 out of 10 without medication and a 2 to 3 out of ten with medication and that her pain medication helped control her pain and enabled her to be more active. (Tr. 542-44, 554.) As previously discussed, the record also indicates that the plaintiff was able to engage in a variety of daily activities, such as crocheting, needlepoint, pulling weeds and cutting flowers, attending church, dusting, driving, grocery shopping, and cooking. (Tr. 640, 674, 698, 712-14.)

Although there is objective medical evidence of the plaintiff's degenerative disc disease and soft tissue injury to her left upper extremity, substantial evidence in the record to supports the ALJ's finding that the plaintiff's subjective complaints of pain limited, but did not preclude, her from working. The objective medical evidence, the plaintiff's own daily activities, and her own reports of how medication significantly reduces her pain levels all undercut the credibility of the severity of her subjective complaints of pain.

## V. RECOMMENDATION

For the above stated reasons, it is recommended that the plaintiff's motion for judgment on the administrative record (Docket Entry No. 11) be DENIED, that the defendant's motion for "judgment on the pleadings" (Docket Entry No. 15) be GRANTED, and that the Commissioner's decision be affirmed.

Any objections to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days of service of this Report and Recommendation and must state with particularity the specific portions of the Report and Recommendation to which objection is made. Failure to file written objections within the specified time can be deemed a waiver of the right to appeal the District Court's Order regarding the Report and Recommendation.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).


Respectfully submitted,



JULIET GRIFFIN
United States Magistrate Judge